RECEIVED

2019 JUN 2 IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
DEBRA P. HACKETT, CLERK EASTERN DIVISION
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

UNDER SEAL,                          )
                                     )  Case No: 3 : 19-CV- 455-ALB-CS
        Plaintiff,                   )
                                     )
                                     )
v.                                   )       **FILED UNDER SEAL**
                                     )  **DO NOT PLACE IN PRESS BOX**
                                     )    **DO NOT ENTER ON PACER**
UNDER SEAL                           )
                                     )       **DEMAND FOR JURY**
        Defendants.                  )
                                     )
                                     )
                                     )
                                     )

IN THE UNITED STATES DISTRICT COURT RECEIVED
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

2019 JUN 27  P 4: 49

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* BRYAN BRAZELLE, ))) | Case No: 3:19-CV-455-ALB-CSC |
| Plaintiff, )) | |
| v. )) | **FILED UNDER SEAL** |
| ) | **DO NOT PLACE IN PRESS BOX** |
| DIVERSICARE HEALTHCARE ) | **DO NOT ENTER ON PACER** |
| SERVICES, INC.; DIVERSICARE ) | |
| THERAPY SERVICES, LLC; ) | **DEMAND FOR JURY** |
| DIVERSICARE LEASING CORP; ) | |
| DIVERSICARE MANAGEMENT ) | |
| SERVICES CO., INC; KELLIE ) | |
| LEMONS; CHARLES JAMES; ) | |
| ) | |
| Defendants. ) | |

## *QUI TAM* COMPLAINT

Relator Bryan Brazelle, on behalf of himself and the United States of America, alleges and claims as follows against Defendants Diversicare Healthcare Services, Inc.; Diversicare Therapy Services, LLC; Diversicare Leasing Corp.; Diversicare Management Services Co., Inc. (collectively, Diversicare); Kellie Lemons; and Charles James:

2

## JURISDICTION AND VENUE

1.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-33 (the "False Claims Act").  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Jurisdiction is also authorized under 31 U.S.C. § 3732(a).

2.     Venue lies in this judicial district pursuant to 31 U.S.C. § 3732(a), because Defendants qualify to do business in the State of Alabama, transact substantial business in the State of Alabama, transact substantial business in this judicial district, and can be found here.   Additionally, as described herein, Defendants committed within this judicial district acts proscribed by 31 U.S.C. § 3729.  Specifically, Defendants submitted, caused to be submitted and conspired to submit false claims for therapy services that were never provided and made or used false records or statements material to those false claims.

## PARTIES

3.     Defendant Diversicare Healthcare Services, Inc., is a Delaware corporation with its principal place of business in Brentwood, Tennessee. Diversicare provides long-term care services, including comprehensive rehabilitation services, to patients in ten states, including Alabama.   In total, Diversicare operates 72 nursing centers with 8,214 licensed nursing beds. Diversicare owns 15 of its nursing centers and leases 57 others.   One of Diversicare's facilities is Canterbury Health Care Facility (Canterbury) in Phenix

3

City, Alabama. Diversicare's disclosures indicate that Diversicare leases many of its facilities through Defendant Diversicare Leasing Services Corp. and provides facility management services through Defendant Diversicare Management Services Co. Through Defendant Diversicare Therapy Services, LLC, Diversicare provides a full range of rehabilitative therapy services to its facility patients.

4.      Defendant Kellie Lemons is a Certified Occupational Therapy Assistant licensed in Alabama. Ms. Lemons has been employed as an occupational therapy assistant at Canterbury since approximately 2014.

5.      Defendant Charles James is a Certified Occupational Therapy Assistant (COTA) licensed in Alabama. Mr. James has been employed as an occupational therapy assistant at Canterbury since approximately 2011.

6.      Relator Bryan Brazelle has been a licensed physical therapist for 20 years. Mr. Brazelle began working as a therapist at Diversicare's Canterbury location in 2016, first as a contractor and, since October 2018, as a direct employee of Diversicare. Relator Brazelle has, on many occasions, personally observed COTAs Lemons and James falsifying records to bill for occupational therapy services that were never performed and has confirmed through examination of company records that Diversicare, despite knowledge and condonement of the actions of Lemons and James, has submitted false claims for reimbursement for these services.

4

7. Prior to filing this Complaint, Relator Brazelle voluntarily disclosed to the Government the information upon which this action is based. To the extent that any public disclosure has taken place as defined by 31 U.S.C. §3729(e)(4)(A), Relator is the original source of the information for purposes of that Section. Alternatively, Relator has knowledge that is independent of and materially adds to any purported publicly disclosed allegations or transactions, and Relator voluntarily provided that information to the Government before filing this Complaint. Relator is serving contemporaneously herewith a statement of the material evidence in his possession upon which his claims are based.

## MEDICARE COVERAGE FOR SKILLED THERAPY

8. For purposes of Diversicare's business model and this action, Medicare offers two types of reimbursement for skilled rehabilitative therapy: (A) under Medicare Part A through the skilled nursing benefit and (B) under Medicare Part B as fee-per-service "outpatient" therapy. Diversicare provides and submits claims for both types of therapy at its Canterbury location.

### A. Therapy Coverage Under Medicare Part A

9. Through the Medicare Program ("Medicare"), Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395, et seq., the United States provides health insurance coverage for eligible citizens. Medicare is overseen by the United States

5

Department of Health and Human Services through its Center for Medicare and Medicaid Services ("CMS").

10.     Through Medicare Part A hospital insurance, Medicare pays for skilled rehabilitative therapy, which includes three disciplines: physical therapy, occupational therapy and speech-language pathology. For Medicare Part A to cover rehabilitative therapy, such therapy must provided as part of a patient's physician-prescribed hospital or post-hospital skilled nursing facility plan of care.

11.     In order to qualify for skilled nursing coverage, a patient otherwise appropriate for Medicare must show a qualifying hospital stay of three or more days within the 30 days prior to entering the skilled nursing facility. *See* 42 C.F.R. 409.30. A physician must order procedures for the patient that are appropriate to be performed only in a Skilled Nursing Facility (SNF), such as rehabilitative therapy, and must certify that the patient's condition is such that he or she can practically be cared for only in a SNF. *Id.* In so certifying, the physician must determine that the patient's condition should improve or achieve stability in response to skilled care. *Id.*

12.     Upon satisfaction of those requirements, Medicare will pay for 100 days of skilled nursing care per-patient, per-illness period, so long as the patient continues to require and benefit from skilled care on a daily basis (though, after 20 days, a coinsurance payment is required of the patient). *Id.*

13.     Medicare regulations require the SNF medical staff to write a plan of care for each skilled nursing patient based upon the individual's needs and circumstances.   *Id.* The patient's care plan must be designed by a physician or by the licensed physical therapist, occupational therapist or speech-language pathologist who actually performs the services and must describe the type, length, frequency, and duration of treatment.   42 C.F.R. §§ 409.23; 409.17.   Further, physical therapy, occupational therapy or speech-language pathology services must be furnished by qualified physical therapists, physical therapist assistants, occupational therapists, occupational therapy assistants, or speech-language pathologists, respectively. 42 C.F.R. § 409.17.

14.     To qualify for reimbursement – and to constitute legitimate therapy for purposes of Medicare required patient assessments known as "MDS" assessments – therapeutic care must actually require the skill of a professional: "[t]herapy services are considered skilled when they are so inherently complex that they can be safely and effectively performed only by, or under the supervision of, a qualified therapist." *See* MEDICARE BENEFIT POLICY MANUAL, Chapter 8, § 30.4[1]; *see also* 42 C.F.R. § 409.32.  These skilled services may be necessary to improve the patient's current condition, to maintain the patient's current condition, or to prevent or slow further deterioration of the patient's condition.  *See* MEDICARE

---

[1] http://www.cms.gov/manuals/Downloads/bp102c08.pdf

BENEFIT POLICY MANUAL, Chapter 8, § 30.4. If all other requirements for coverage under the SNF benefit are met, such skilled therapy services are covered when an individualized assessment of the patient's clinical condition demonstrates that the specialized judgment, knowledge, and skills of a qualified therapist are necessary for the performance of the rehabilitation services. *Id.*

**B.     Therapy Coverage Under Medicare Part B**

15.     Through Medicare Part B supplemental insurance, Medicare reimburses under limited circumstances for therapy services provided on an outpatient basis. In order to qualify for reimbursement, outpatient therapy services must: (1) be reasonable and medically necessary; (2) be furnished to a Medicare beneficiary under the care of a physician; (3) be furnished under a plan of care periodically recertified by a physician; and (4) be furnished by or under the direct supervision of qualified personnel. Plan of care requirements are identified at 42 C.F.R. § 410.60.

16.     In order to qualify for reimbursement, therapy services must constitute skilled therapy; that is, such services must either qualify as rehabilitative therapy or, if consisting of maintenance therapy, must require the skills of a qualified therapist due to the acute condition of the patient. See MEDICARE BENEFIT POLICY MANUAL, Chapter 15, § 220.2, available at: http://www.cms.gov/manuals/Downloads/bp102c08.pdf

8

17.   In addition to the specific requirements of the Part A and Part B therapy reimbursement systems, it is a universal requirement of the Medicare program that all services provided must be reasonable and medically necessary. *See* 42 U.S.C. §1395y(a)(1)(A); 42 U.S.C. § 1396, *et seq.* Medicare providers may not bill the United States for medically unnecessary services or procedures performed solely for the profit of the provider. *Id.*

18.   To enroll as a Medicare provider, Diversicare was required to submit a Medicare Enrollment Application for Institutional Providers. *See* CMS Form 855A. In submitting Form 855A, Diversicare made the following "Certification Statement" to CMS:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal Anti-Kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

19.   Upon qualifying, Diversicare billed Medicare for Medicare Part A claims by submitting a claim form (CMS Form 1450) to the fiscal intermediary ("FI") or Medicare Administrative Contractor ("MAC") responsible for

9

administering Part A Medicare claims on behalf of the United States. *See* CMS Form 1450. Each time it submitted a claim to the United States through the FI, Diversicare certified that the claim was true, correct, and complete and complied with all Medicare laws and regulations.

20.     Further, Diversicare billed Medicare for Medicare Part B claims by submitting claim form CMS Form 1500 to the fiscal intermediary ("FI") or Medicare Administrative Contractor ("MAC") responsible for administering Part B Medicare claims on behalf of the United States. *See* CMS Form 1500. Each time it submitted a claim to the United States through the FI, Diversicare certified that the claim was true, correct, and complete and complied with all Medicare laws and regulations.

## DEFENDANTS' FRAUDULENT SCHEMES

21.     Defendants have perpetrated a fraudulent scheme to falsely bill the United States through the Medicare program for occupational therapy services that were never performed.

22.     It is well-known to the Diversicare management at its Canterbury facility and Diversicare regional management – as well as to the staff and many of the patients – that COTAs Lemons and James regularly clock in for work and then leave the facility (often to ostensibly perform therapy work for other companies who also are likely billing Medicare for these other services), but still record a full

10

schedule of therapy services for the day, which are never performed. Despite this knowledge, Diversicare bills for the services recorded – but not rendered – by Lemons and James. Meanwhile, numerous Medicare patients residing in Diversicare's facilities do not receive the treatment mandated by their plans of care and likely do not regain the functionality they might have with proper therapeutic treatment.

**A.    Diversicare knows that its clinicians are recording therapy services they are not providing.**

23.    Beginning 2011 James has billed for services not provided and when Lemons joined Diversicare at Canterbury in 2014, these practices escalated. Since, Relator Brazelle and his clinician colleagues in Diversicare's Canterbury facility have observed COTAs Lemons and James clock in for work (or clock one another in, with the other entirely absent) and simply leave the facility for a significant portion of the day (if not its entirety), all while recording a full day's worth of therapy minutes, most of which were never provided. Both James and Lemons have told Relator at various times that they were "moonlighting" for area home health companies – Lemons for Kindred Home Health and James for Amedisys Home Health and LHC Home Health of Auburn. Lemons is also known to work part-time at another assisted living facility in Phenix City, Parkwood Healthcare. Plainly, Lemons and James are clocking in for their Diversicare jobs, leaving to see

11

home health or SNF patients (also Medicare beneficiaries, very likely) for their other employers, and claiming to have done both at the same time.

24. Diversicare is well-aware of the fraud being perpetrated by Lemons and James, having received reports from other clinicians as well as from patients who have not been provided their prescribed treatment. For example, in early 2019, Patient J.P. was a resident at the Canterbury facility and a Diversicare patient. Defendant Lemons was assigned to provide occupational therapy to J.P., but consistently failed to do so. Patient J.P.'s former daughter-in-law, Ms. P., learned that J.P. was not receiving her prescribed treatment from Lemons and reported the situation to Diversicare Director of Rehab Zulema Turner-Buckner. Upon learning she had been reported to management, Lemons responded by scolding Patient J.P.—an 81-year old patient with a diagnosis of generalized muscle weakness whose therapy goals are "to be able to take care of myself"—for reporting to management that she had not received her prescribed therapy designed to help accomplish her goal. Thus, Lemons further abused a patient whom she had already deprived of treatment. Even more outrageously, Lemons then attempted to discharge Patient J.P. from occupational therapy services, claiming that Patient J.P. was not making progress. Meanwhile, Diversicare falsely billed for the services that it knew Defendant Lemons never provided.

25.     Patient J.P.'s example is one of many. Clinicians that raise concerns, however, are ostracized and pushed out. Patients and clinicians routinely complain to Diversicare's management—primarily facility Director Turner-Buckner. Specifically, in or around May 2018, Diversicare at Canterbury COTA Dara Schares reported to Director Turner-Buckner that patients were not being seen by Defendant Lemons for prescribed OT services. After Director Turner-Buckner orchestrated a confrontation between Ms. Schares and Defendant Lemons, and sided with Defendant Lemons despite clear evidence of fraud and patient neglect, Ms. Schares was forced to resign.

26.     Turner-Buckner's supervisor and Diversicare Director of Rehab for Alabama Mohit Sobti is also aware of this fraud through exit interviews of employees forced to quit due to ongoing fraud and patient neglect.

27.     Specifically, occupational therapist Kyle Fasette was employed as an occupational therapist by Diversicare at Canterbury for approximately two years until resigning in March 2019 due to Diversicare's fraud alleged herein.   Mr. Fasette, like Relator and numerous others, consistently witnessed Defendants Lemons and James neglect their duties of patient care yet bill Medicare as though these services had been provided. In or around March 2019, Fasette had a verbal confrontation with Defendant Lemons regarding this fraud and resigned from his position with Diversicare shortly thereafter.  In his exit interview with Mr. Sobti,

13

the Diversicare manager in charge of all Diversicare rehab programs in Alabama, Mr. Fasette relayed that he was resigning due to the ongoing fraud and patient neglect at Canterbury. Yet, as detailed *supra*, Defendants continue to commit this fraud and patient neglect and have made no effort to refund Medicare for years of flagrant fraud.

28. When patients complain about lack of care, Diversicare simply transfers them to another therapist. For example, Patient L.M. was a Canterbury resident and Lemons patient whose two sisters were almost constantly at her bedside in Canterbury. The sisters knew that L.M. was not receiving therapy and complained to Diversicare. Lemons again denied everything and Diversicare transferred L.M. to another occupational therapist, apparently failing to properly investigate Lemons' fraud or correct the improper bills it had submitted to Medicare.

**B.    Diversicare bills for services it knows were never provided.**

29. Despite the full knowledge that Lemons and James are not at the facility much of the day, are not providing the services prescribed to their patients, and are fraudulently recording otherwise, Diversicare submits Medicare claims for those services. Along with his personal observations at the Canterbury facility, Relator has access to both Diversicare's therapy schedule and its medical records system and can easily compare (1) the hours during which Lemons and James can

14

be seen at the facility; (2) the times during which they clock in and out; (3) the minutes of therapy they are scheduled to provide on a given day and (4) the patient records showing the services actually recorded by Lemons and James to be billed by Diversicare. Taken together (and supplemented by conversations with the patients in question and with other clinicians at Canterbury) these records demonstrate Defendants' fraud very clearly. The following are several representative examples of Defendants' false claims, broken out by day:

  **i. May 6, 2019**

  30. On this date, Relator Brazelle observed Defendant Kellie Lemons arrive at the Canterbury facility at 12:45 pm and leave at 2:30 pm. Lemons returned at 5:25 pm and sat at the computer next to Relator Brazelle, recording the therapy services she had purportedly provided that day. She left 10 minutes later at 5:35 pm, not to return before Relator Brazelle left for the day at 7:15 pm. Lemons was in the facility for a total of 1 hour, 55 minutes.

  31. Defendant Lemons was scheduled to see 10 patients on May 6, for a total of 7 hours, 5 minutes of treatment. Before leaving the facility, Relator Brazelle spoke with the 10 patients and learned only two of them had received care from Defendant Lemons, and those for a short time. Eight of the patients had received no treatment at all.

32.     Relator Brazelle examined the patients' records and found that Defendant Lemons had nevertheless recorded a full day's worth of therapy service. The following table shows each patient, the therapy minutes prescribed for May 6, whether they were actually seen by Defendant Lemons on that day, and the therapy services recorded as performed by Ms. Lemons and then billed by Diversicare:

| PATIENT | THERAPY MINUTES PRESCRIBED | SEEN BY LEMONS | SERVICES BILLED |
|---|---|---|---|
| Patient M.B., a wound care patient scheduled to be seen 5 times a week for 30 days [non-Medicare] | 35 minutes | NO | CPT Code 97530 (a 15 minute therapeutic activity timed code, use of dynamic activities to improve functional performance), 2 Units, 35 minutes |
| Patient G.D., a cardiac patient scheduled to be seen 5 times a week for 72 days | 40 minutes | NO | CPT Code 97110 (a 15 minute therapeutic exercise timed code, to improve patient parameter such as strength) 3 Units, 40 minutes |
| Patient L.G. [non-Medicare] | 35 minutes | YES | 97710, 1 Unit, 15 minutes;<br><br>97530, 1 Unit, 20 minutes |
| Patient F.C. | 35 minutes | NO | 97710, 2 Units, 40 minutes |
| Patient H.F., admitted for "general | 75 minutes | NO | 97710, 2 Units, 30 minutes; |

16

| | | | |
|---|---|---|---|
| weakness" and scheduled to be seen 5 days a week for 72 days | | | 97530, 3 Units, 45 minutes |
| Patient B.K. | 35 minutes | **NO** | 97710, 1 Unit, 20 minutes; 97530, 1 Unit, 15 minutes |
| Patient A.D. [non-Medicare] | 30 minutes | **NO** | 97530, 2 Units, 30 minutes |
| Patient J.F. | 70 minutes | **YES** | CPT Code 97535 (Self Care/Home Management training), 1 Unit, 15 minutes; 97530, 1 Unit 25 minutes |
| Patient M.M. | 40 minutes | **NO** | 97710, 1 Unit, 18 minutes; 97530, 2 Unit, 23 minutes |
| Patient M.F. | 30 minutes | **NO** | 97710, 1 Unit, 15 minutes; 97530, 1 Unit, 15 minutes |

**ii.    May 23, 2019**

33.    On this date, Relator Brazelle observed Defendant Charles James arrive at Canterbury at 10:30 am, leaving at 12:15. Defendant James returned at 1:45 pm and departed at 2:30 – seeing no patients during the latter interval. He could have performed no more than one hour, 45 minutes of therapy that day, but he recorded and Diversicare billed over five hours of therapy service. In fact,

17

Relator observed Defendant James perform about 45 total minutes of therapy while he was in the facility; at least two of his patients received no treatment at all:

| PATIENT | THERAPY MINUTES PRESCRIBED | THERAPY ACTUALLY RECEIVED | SERVICES BILLED |
|---------|---------------------------|---------------------------|-----------------|
| Patient D.F., a dementia patient scheduled to be seen 5 times a week for 29 days | 50 minutes | 10 minutes | 97710, 1 Units, 20 minutes<br><br>97530, 2 Units, 30 minutes |
| Patient H.F., admitted for "general weakness" and scheduled for 5 days a week for 72 days | 70 minutes | 10 minutes | 97710, 2 Units, 30 minutes<br><br>97530, 3 Units, 40 minutes |
| Patient L.G. [non-Medicare] | 35 minutes | 0 minutes | 97530, 2 Units, 35 minutes |
| Patient K.H. | 50 minutes | 10 minutes | 97710, 3 Units, 50 minutes |
| Patient J.K. [non-Medicare] | 55 minutes | 15 minutes | 97535, Units, 30 minutes |
| Patient A.S. | 45 minutes | 12 minutes | 97710, 2 Units, 30 minutes<br><br>97530, 1 Unit, 15 minutes |

### iii.  May 27, 2019

### Defendant Charles James

18

34.    Relator Brazelle observed Defendant James arrive at Canterbury at 9:50 am and depart at 12:15 am.  Mr. James returned at 1:15 and left 15 minutes later for the day.  He was in the facility for approximately two and a half hours, but he recorded the full five hour, 20 minutes of therapy on his schedule.    James recorded the following therapy services to be billed, but could not possibly have performed even half of them:

| PATIENT | THERAPY MINUTES PRESCRIBED | SERVICES BILLED |
|---|---|---|
| Patient D.F., a dementia patient scheduled to be seen 5 times a week for 29 days | 50 minutes | 97710, 2 Unit, 30 minutes; <br><br> 97530, 1 Unit, 20 minutes; <br><br> 97535, 1 Unit, 15 minutes |
| Patient, H.F., admitted for "general weakness" and scheduled for 5 days a week for 72 days | 70 minutes | 97710, 2 Units, 30 minutes; <br><br> 97530, 2 Units, 25 minutes <br><br> 97535, 1 Unit, 15 minutes |
| Patient K.H. | 45 minutes | CPT Code 97542 (Wheelchair Management training), 1 Unit, 15minutes <br><br> 97710, 2 Units, 30 minutes; |

| Patient J.K., admitted for femur fracture and scheduled to be seen 5 times a week for 72 days [non-Medicare?] | 45minutes | 97710, 2 Units, 30 minutes<br><br>97530, 1 Unit, 15 minutes |
| --- | --- | --- |
| Patient M.L., a CHF patient scheduled to be seen 5 days a week for 30 days | 30 minutes | 97710, 1 Unit, 15 minutes<br><br>97530, 1 Unit, 15 minutes |
| Patient G.L. [non-Medicare] | 35 minutes | 97710, 1 Unit, 15 minutes<br><br>97530, 1 Unit, 20 minutes |
| Patient A.S. | 45 minutes | 97530, 2 Units, 30<br><br>97710, 1 Unit, 15 minutes |

### Defendant Kellie Lemons

35. On May 27, 2019 Relator Brazelle was in the Canterbury facility from early-morning until 4 pm, and did not see Defendant Lemons arrive. The following day, Relator questioned the six patients on Ms. Lemons' May 27 schedule and only one patient, M.M., reported seeing Lemons at all, when she stopped by M.M.'s room about 6 pm to talk, but performed no therapy services. Yet Lemons falsely billed as though she had seen each patient.

36. These examples represent thousands of hours per year of therapy services falsely recorded by Lemons and Charles. Even if Diversicare management

20

had not received repeated, specific, direct reports of this fraud, it could hardly have failed to notice that two of its therapist were never at the facility but were billing full days' worth of services. Nevertheless, it continued to submit claims for reimbursement based upon these fraudulent records. Obviously, Diversicare management is aware that its claims are false, but continues to bill the United States for these services in order to fraudulently profit from the misconduct of Lemons and Charles.

## COUNT ONE
## PRESENTING OR CAUSING TO BE PRESENTED FALSE CLAIMS
## UNDER 31 U.S.C. § 3729

37.     Relator adopts and incorporates paragraphs 1-36 as though fully set forth herein.

38.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – presented or caused to be presented false or fraudulent claims to the United States for payment or approval, to wit:

Through its requests for payment via CMS Form 1450, CMS Form 1500 or otherwise, Diversicare submitted false claims for therapy payments that were never performed, in violation of 42 C.F.R. 409.20 and 42 U.S.C. § 1395y(a)(1)(A).

21

39.     By recording therapy services that they never provided, Defendants Lemons and James caused these false claims to be submitted.

WHEREFORE, Relator requests entry of judgment in his favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

### COUNT TWO
### MAKING OR USING FALSE STATEMENTS OR RECORDS MATERIAL TO A FALSE CLAIM UNDER 31 U.S.C. § 3729

40.     Relator adopts and incorporates paragraphs 1-36 as though fully set forth herein.

41.     By and through the fraudulent schemes described herein, Defendants knowingly – by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information – made, used, or caused to be made or used, false records or statements material to a false or fraudulent claim to get a false or fraudulent claim paid or approved by the United States, to wit:

(a)     Defendants made and used false records reflecting therapy services that were never provided, all in violation of 42 U.S.C. § 1395y(a)(1)(A) and the Medicare regulations cited *supra*;

22

(b)     Defendants made and used false CMS Forms 1450, 1500 and 855A and other false certifications regarding past, present, or future compliance with a prerequisite for payment or reimbursement by the United States through Medicare or Medicaid when in fact Defendants intended to – and did – defraud the Medicare system by falsely claiming reimbursement for services not provided.

42.     The false records or statements described herein were material to the false claims submitted or caused to be submitted by Defendants to the United States.

43.     In reliance upon Defendants' false statements and records, the United States paid false claims submitted by Defendants that it would not have paid if not for those false statements and records.

44.     Defendants' fraudulent actions described herein have resulted in damage to the United States equal to the amount paid or reimbursed to Defendants and others by the United States for such false or fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States, and against Defendants, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees and costs, and such other, different, or further relief to which Relator may be entitled.

23

## COUNT THREE
## REVERSE FALSE CLAIMS
## 31 U.S.C. §3729(a)(1)(G)

45.     Relator adopts and incorporates paragraphs 1-36 as though fully set forth herein.

46.     By and through the fraudulent schemes describe herein, Defendants knowingly—by actual knowledge or in deliberate ignorance or with reckless disregard of the truth or falsity of the information—made, used or caused to be made or used, false records or statements material to an obligation to pay or transmit money or property to the United States, or knowingly and improperly avoided an obligation to pay or transmit money or property to the United States, to wit:

Defendants knew they received substantial reimbursement from the Medicare program for therapy services that were never provided, but took no action to satisfy their obligations to the United States to repay or refund those payments and instead retained the funds and continued to bill the United States for services that were never performed.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States and against Defendants, jointly and severely, in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with

24

civil penalties as permitted by 31 U.S.C. § 3729, attorneys' fees, costs, interest and such other, different or further relief to which Relator may be entitled.

## COUNT FOUR
## CONSPIRACY UNDER 31 U.S.C. §
## 3729(a)(2)

47.     Relator adopts and incorporates paragraphs 1-36 as though fully set forth herein.

48.     Defendants knowingly presented, or caused to be presented, to officers and employees of the United States, false or fraudulent claims for payment or approval, to-wit: Defendants knowingly submitted and caused to be submitted false claims for therapy services that were never provided.

49.     The United States paid Defendants for such false claims.

50.     Defendants, in concert with each other and with their principals, agents, employees, and other institutions did agree to submit such false claims to the United States.

51.     Defendants and their principals, agents, and employees acted, by and through the conduct described *supra*, with the intent to defraud the United States by submitting false claims for payment to the United States through Medicare and Medicaid.

52.     Defendants' fraudulent actions, together with the fraudulent actions of their principals, agents and employees, have resulted in damage to the United

25

States equal to the amount paid by the United States to Defendants and others as a result of Defendants' fraudulent claims.

WHEREFORE, Relator demands judgment in his favor on behalf of the United States and against Defendants in an amount equal to treble the damages sustained by reason of Defendants' conduct, together with civil penalties as permitted by 31 U.S.C. § 3729 and attorneys' fees, costs, interest, and such other, different, or further relief to which Relator may be entitled.

Date: June 26, 2019

JAMES F. BARGER JR. (ASB-2336-M76b)
J. ELLIOTT WALTHALL (ASB-0967-E58W)
BENJAMIN P. BUCY (GA BAR 526064)
FROHSIN BARGER & WALTHALL

Attorneys for Relator

OF COUNSEL

FROHSIN BARGER & WALTHALL
100 Main Street
Saint Simons Island, Georgia 31522
Tel:   205.933.4006
Fax:   205.933.4008

**RELATOR DEMANDS A TRIAL BY JURY**

## CERTIFICATE OF SERVICE

On or before this the 8th of July, 2019, Relator hereby certifies that, in compliance with Rule 4 of the Federal Rules of Civil Procedure, service of the Qui Tam Complaint has been executed as follows:

By Certified Mail to:
United States Attorney for the Middle District of Alabama
131 Clayton Street
Montgomery, AL 36104

By Certified Mail to:
Attorney General of the United States of America
Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Benjamin P. Bucy